IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

KIMBERLY SCARBERRY,

      Plaintiff,

v.                                              CASE NO. 2:04-cv-00413

JO ANNE BARNHART,
Commissioner of Social Security,

      Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are Plaintiff's Motion for Judgment on the Pleading or in the Alternative for Remand and Defendant's Motion for Judgment on the Pleadings.

Plaintiff, Kimberly Scarberry (hereinafter referred to as "Claimant"), filed an application for SSI on May 14, 2001, alleging disability as of August 9, 1998, due to anxiety and depression, a right shoulder impairment and low intellectual functioning.  (Tr.

at 60-65, 74.)   The claim was denied initially and upon reconsideration.  (Tr. at 43-47, 50-52.)  On May 31, 2002, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 53.)  The hearing was held on October 21, 2001, before the Honorable David Antrobus.  (Tr. at 318-38.)  By decision dated November 13, 2002, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 19-27.)  The ALJ's decision became the final decision of the Commissioner on March 4, 2004, when the Appeals Council denied Claimant's request for review.  (Tr. at 5-9.)  On April 29, 2004, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first

2

inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

3

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 20.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of degenerative disc disease of the cervical spine, bipolar disorder, depression and anxiety. (Tr. at 22.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 22-23.) The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations. (Tr. at 24.) Claimant has no past relevant work. (Tr. at 24.) Finally, the ALJ concluded that Claimant could perform jobs such as receptionist, surveillance monitor and production inspector, which exist in significant numbers in the national economy. (Tr. at 25.) On this basis, benefits were denied. (Tr. at 25-26.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the

4

case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was thirty-five years old at the time of the administrative hearing. (Tr. at 321.) Claimant completed the ninth grade and repeated several grades. (Tr. at 321, 327.) Claimant has no past relevant work history. (Tr. at 321.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

Evidence before the ALJ

In August of 1998, at the age of 30, Claimant injured her right shoulder while working as a hotel maid. Shoulder x-rays showed no acute fracture or dislocation. (Tr. at 125.) Claimant

5

was diagnosed with acute right shoulder strain and excused from work for ten days.  (Tr. at 121.)

The record includes treatment notes from David E. Ede, M.D. dated August 18, 1998, through November 6, 2000.  On August 18, 1998, Claimant reported pain and numbness in her shoulder.  Dr. Ede noted that x-rays of the shoulder were unremarkable, but that x-rays of the cervical spine demonstrated advanced narrowing of the C4-5 disc levels with spurring and narrowing of the C5-6 levels, which is graded as minimal.  He diagnosed advanced degenerative disc disease, C4-5 with cervical radiculitis and cervico-occipital neuralgia.  (Tr. at 139.)  Claimant reported an allergy to anti-inflammatory medication.  Dr. Ede recommended rehabilitation.  (Tr. at 138.)  On September 15, 1998, Dr. Ede recommended Claimant undergo an EMG (Tr. at 138), which was normal (Tr. at 137).  On October 5, 1998, Claimant reported she was ten to fifteen percent better.  Claimant had hypoactive right biceps reflex, but otherwise was neurologically intact.  Dr. Ede opined that because Claimant's numbness had been replaced by tingling, this was a sign of return of function.  Claimant also reported improvement in her range of motion.  He recommended that Claimant stay off work for another month.  (Tr. at 138.)  On November 2, 1998, Claimant reported continued pain with radiation down her right arm.  Claimant had tenderness in the suboccipital region of her neck.  Claimant had symmetrical reflexes and Grade V motor strength bilaterally.  Dr.

6

Ede recommended an MRI to rule out herniated discs.  (Tr. at 137.)

On January 30, 1998, Dr. Ede noted that the MRI demonstrated no evidence of a herniated disc.  Dr. Ede recommended that Claimant undergo a cortisone injection.  (Tr. at 137.)  On February 14, 1998, Claimant reported no improvement following the injection. Claimant had symmetrical reflexes and intact sensation to the upper extremities.  Dr. Ede referred Claimant to a pain clinic.  He noted that Claimant would not be able to perform work other than sedentary work for two months.  (Tr. at 136.)

On February 8, 1998, Claimant was awaiting her pain clinic appointment with Timothy Deer, M.D.  Dr. Ede noted that Claimant had symmetrical reflexes and mild tenderness in the paraspinal musculatures of the cervical spine.  (Tr. at 136.)  On March 8, 1999, Claimant continued to await her pain clinic appointment. Claimant had a positive Tinel's sign at the wrist with radiation to the shoulder.  Because of her negative EMG, Dr. Ede characterized these symptoms as "perplexing."  (Tr. at 136.)  She had symmetrical reflexes bilaterally.  Dr. Ede injected the carpal canal with Aristocort.  (Tr. at 136.)  On March 19, 1999, Claimant reported continued pain in the right upper extremity with radiation down into the hand and wrist.  Claimant had positive Tinel's sign in the wrist and a positive Phalen's sign.  Dr. Ede recommended a repeat EMG and MRI.  (Tr. at 135.)

On January 20, 1999, Dr. Ede noted that the EMG showed no

7

evidence of neuropathy or radiculopathy. The MRI showed no evidence of intra-articular shoulder pathology. He noted that Claimant had been to the pain clinic and would begin injections. (Tr. at 135.) On May 14, 1999, Claimant continued with significant pain and reported taking two Percocets per day. Claimant had trigger points about the CT junction. Sensory exam was intact to light touch throughout the upper extremities. She had symmetrical reflexes. (Tr. at 134.) On June 11, 1999, Claimant reported no change in her symptoms despite recent injections. On July 23, 1999, Claimant continued to complain of pain in the back of the shoulder with radiation down the arm. Claimant had diffuse tenderness along the dorsal trapezial region. She has symmetrical reflexes. She had significant tenderness along the lateral epicondylar region of the left elbow. Dr. Ede diagnosed cervical radiculitis, persistent and chronic pain and left lateral epicondylitis. (Tr. at 134.)

On August 27, 1999, Claimant reported minimal improvement with injections. (Tr. at 133.) On November 19, 1999, Dr. Ede noted that Claimant would receive an implantable spinal cord stimulator. (Tr. at 132.) On January 14, 2000, Dr. Ede found exquisite tenderness along the acromial region. Forward elevation was actively ten degrees and abduction was ten degrees. Claimant had exquisite irritability with circumduction of the shoulder. Dr. Ede administered a cortisone injection. (Tr. at 132.)

On June 19, 2000, Dr. Ede recommended that Claimant continue with pain management and that if she continued to have pain once completed, he could perform arthroscopy within the shoulder itself. He noted this would mostly be for diagnostic purposes since findings did not show any anatomic pathology. (Tr. at 130.) On July 31, 2000, Claimant reported significant and severe disabling pain in the right upper extremity. Dr. Ede scheduled arthroscopy. (Tr. at 130.) On September 5, 2000, Dr. Ede noted Claimant's diagnosis of status post arthroscopy right shoulder with debridement labral tear and electrothermal capsular shrinkage. He prescribed physical therapy. (Tr. at 130.) On October 3, 2000, Claimant reported overall generalized improvement with physical therapy. On November 6, 2000, Dr. Ede noted Claimant had shown minimal improvement and was trying to decide whether to have an implantable device. He indicated he had no further surgery to offer Claimant and requested that Claimant transfer her care to the pain clinic. (Tr. at 129.)

The record includes treatment notes and other evidence from Dr. Deer dated June 10, 1999, through May 23, 2001. (Tr. at 145-59, 163-205.) On June 10, 1999, and July 6, 1999, Dr. Deer performed a diagnostic stellate ganglion block. He diagnosed sympathetically mediated pain of the right upper extremity. (Tr. at 157, 159.) On July 28, 1999, Claimant reported persistent right upper extremity pain with no improvement after stellate ganglion

blocks on two occasions. Dr. Deer noted that this "certainly supports that this is not a sympathetically mediated dystrophy and more related to a frozen shoulder from disuse." (Tr. at 202.) Claimant had mild swelling in her right hand, but there was good color and no temperature changes and marked improvement in her range of motion and strength. Claimant's right shoulder continued to show marked limitation in movement, severe tenderness to touch and decreased ability to abduct, external or internal rotate. He recommended suprascapular nerve blocks twice a week for six to twelve weeks with aggressive physical therapy, which Claimant underwent. (Tr. at 202.)

On August 2, 1999, following the first block, Claimant reported mild improvement. (Tr. at 200.) On August 4, 1999, Claimant reported that her hand was better, but that her shoulder continued to be painful. (Tr. at 198.) On August 9, 1999, Claimant's passive range of motion appeared to be much better, though her active range of motion was limited. (Tr. at 197.) On August 17, 1999, Dr. Deer noted that Claimant's previous stellate ganglion blocks had not provided much relief, and he performed a third block. (Tr. at 194.) On August 23, 1999, Dr. Deer administered another nerve block and noted Claimant's active range of motion appeared to be improving slowly. (Tr. at 192.) Dr. Deer administered additional blocks on August 25, 1999, and August 30, 1999. (Tr. at 190-92, 177.) On September 8, 1999, Claimant

reported doing the "same overall." Dr. Deer did not feel that
Claimant was a good candidate for future blocks. He did not feel
that Claimant's pain was "sympathetic based on her previously
negative diagnostic and her lack of sympathetic symptoms." (Tr. at
188.) Dr. Deer found marked impingement and decreased range of
motion. Dr. Deer recommended the placement of a tunneled epidural
catheter. (Tr. at 188.)

On November 30, 1999, Dr. Deer noted that Claimant's neck was
tender with limiting motion. Claimant had tenderness in the right
shoulder. Peripheral pulses were palpable, there was no edema and
no cyanosis or clubbing in the extremities. Claimant had weakness
of the right arm with gripping. Reflexes in the right upper
extremity could not be elicited, but the remaining reflexes were
intact. (Tr. at 153.) Dr. Deer inserted a tunneled epidural
catheter. (Tr. at 155.) On December 13, 1999, Claimant reported
doing fairly well, but with no improvement in her motion. Dr. Deer
prescribed Lortab. (Tr. at 185.) On January 10, 2000, Claimant
reported to Dr. Deer and was accompanied by her rehab counselor.
Dr. Deer noted that Claimant suffers from "frozen right shoulder
secondary to deconditioning with myofascial spasm. She has no
evident RSD at this point, but she still has persistent findings
consistent with a causalgia and combined mixed pain syndrome."
(Tr. at 183.) Dr. Deer recommended discontinuing the Lortab,
placing Claimant on low dose Oxycontine and administering trigger

point injections.  (Tr. at 183.)

On February 7, 2000, Dr. Deer wrote that Claimant has "persistent pain in her shoulder, which greatly limits her ability to function.  At this point, she has persistent findings consistent with spasm and deconditioning."  (Tr. at 181.)  Dr. Deer recommended trigger points, visits to the pain management clinic, oral medication and suprascapular blocks.  Dr. Deer advised Claimant that she should check with her family physician to assure there are "no other medical problems ongoing that could account for some of her symptoms."  (Tr. at 181.)  On July 10, 2000, Dr. Deer noted that Claimant's MRI showed no obvious surgical lesions, but that Claimant may have some lesions that can be found by endoscopic surgery.  He noted Dr. Ede was considering reoperation for this purpose.  Dr. Deer further noted that nerve blocks were only temporarily helpful and oral medications, including Oxycontin have failed.  (Tr. at 178.)

On September 6, 2000, Dr. Deer noted Claimant had recently undergone surgery by Dr. Ede, and Dr. Deer decided to hold off on treatment and watch Claimant to see if surgery improved her condition.  (Tr. at 176.)  On October 11, 2000, Dr. Deer noted that Claimant was making no progress in physical therapy.  Claimant had a decreased range of motion of her shoulder, particularly worse on the right with less than 50 degrees abduction.  Claimant had markedly increased hypersensitivity in both her shoulder and left

ulnar nerve root distribution.  (Tr. at 173.)  On November 15, 2000, Dr. Deer noted slow progress and encouraged Claimant to increase her activity.  Dr. Deer noted some C7-C8 nerve root loss. (Tr. at 171.)

On February 23, 2001, Dr. Deer noted that Claimant was very limited in her movement and had a decreased ability to function. Dr. Deer noted that Dr. Ede reported that there was no further surgical treatment he could offer.  Claimant had markedly diminished range of motion in the right shoulder at 70 degrees abduction and a decrease in internal rotation.  Claimant has had decreased extension and severe hypersensitivity and allodynia of the arm.  (Tr. at 169.)  Dr. Deer recommended that Claimant undergo a psychological evaluation and possible stimulation system trial. (Tr. at 169.)  On April 11, 2001, Dr. Deer's examination was essentially unchanged.  (Tr. at 166.)

On May 15, 2001, Dr. Deer noted that Claimant had full range of motion in the neck.  Claimant had right AC-joint tenderness with limited motion in all directions.  (Tr. at 146.)  Deep tendon reflexes were three plus and equal.  There were no sensory or motor changes.  Dr. Deer implanted a trial spinal cord stimulator.  (Tr. at 148.)

The record includes physical therapy notes dated August 3, 1999, through August 30, 1999.  (Tr. at 160-62.)

The record includes treatment notes and other evidence from

13

Shawnee Hills, Inc. dated June 4, 1999, through October 1, 2001.
(Tr. at 207-26.)  On December 8, 1999, John Hutton, M.D. diagnosed
bipolar affective disorder, mixed, moderately severe, without
psychotic symptoms, obsessive compulsive disorder, possible adult
ADD, post traumatic stress disorder and panic disorder.  (Tr. at
222.)  He rated Claimant's GAF at 60.  (Tr. at 226.)  Claimant
reported that the implanted analgesic pump decreased her pain
somewhat.  Dr. Hutton found Claimant neurologically alert and
cooperative.  Attention and concentration were not as good as they
used to be because of cumulative stressors.  Claimant's mood was
stable.  Recent memory, remote memory and immediate memory were
good.  (Tr. at 226.)  Thereafter, treatment notes generally
indicate that Claimant's condition improved (Tr. at 207-21), though
Jeffrey Priddy, M.D. indicated on a prescription pad dated August
14, 2001, that Claimant was unable to work.  (Tr. at 213.)

     The record includes additional physical therapy notes dated
September through October of 2000.  (Tr. at 227-40.)

     On February 23, 2001, Paul Bachwitt, M.D. examined Claimant in
connection with her workers' compensation claim.  Dr. Bachwitt felt
that Claimant could perform light or sedentary work.  Dr. Bachwitt
found no evidence of reflex sympathetic dystrophy.  Claimant had
slight redness on the right hand, but the texture, wetness and
wrinkles were the same bilaterally.  Claimant had numbness of the
ulnar distribution on the right, which does not seem anatomical,

because the muscles on the right are so abnormal and do not follow an anatomical pattern.  Dr. Bachwitt felt it was inappropriate to rate Claimant on her shoulder, he felt the shoulder motions were not reliable.  He rated the cervical spine DRE at five percent and the range of motion at four percent.  He rated the shoulder at zero percent.  He opined that Claimant was not "permanently and totally disabled and is employable from an orthopedic standpoint." (Tr. at 246.)

A State agency source completed a Physical Residual Functional Capacity Assessment on July 18, 2001, and opined that Claimant was limited to light level work with an occasional ability to climb, a limited ability to reach in all directions and a need to avoid even moderate exposure to hazards.  (Tr. at 249-56.)

Ralph  S.  Smith,  Jr.,  M.D.  conducted  a  consultative psychological examination on September 17, 2001, at the request of Dr. Deer.  On the WAIS-III (Verbal Subtests), Claimant attained a verbal  IQ  of  80.   On  the  WRAT-III,  Claimant  attained  scores suggesting reading recognition at the high school level.  Claimant gave poor effort, and the overall validity was somewhat lowered. Dr. Smith diagnosed chronic pain syndrome with psychological and physical factors on Axis I and made no Axis II diagnosis.  He rated Claimant's GAF at 60.  (Tr. at 261.)  He opined that "[d]ue to the high levels of somatization, the childhood history of abuse, and her gross exaggeration on psychological testing, she would be a

15

poor candidate for any invasive pain management procedures." (Tr. at 261.)

A State agency medical source completed a Psychiatric Review Technique form on March 2, 2002, and opined that Claimant had mild restriction of activities of daily living and maintaining social functioning, moderate difficulties in maintaining concentration, persistence of pace and no repeated episodes of decompensation. (Tr. at 262-74.)

The State agency source also completed a Mental Residual Functional Capacity Assessment and opined that Claimant was moderately limited in the ability to maintain attention and concentration for extended periods and set realistic goals or make plans independently. (Tr. at 275-77.)

A State agency medical source completed a Physical Residual Functional Capacity Assessment on March 5, 2002, and opined that Claimant was limited to light work, that she could occasionally climb, balance, stoop, kneel, crouch and crawl, that she was limited on the right in reaching in all directions and that she should avoid concentrated exposure to hazards. (Tr. at 275-86.)

Luis A. Loimil, M.D. examined Claimant on June 4, 2002, in connection with her workers' compensation claim. Dr. Loimil opined that Claimant has a very serious "problem complicated by complex regional pain syndrome. There is no neurological involvement by EMG according to Dr. Ede [who] is a very capable Orthopedist. He

16

stated that there is no further surgery that he can offer to the patient." (Tr. at 298.)   Dr. Loimil recommended that Claimant undergo a functional capacity evaluation and vocational rehabilitation to determine if she is capable of performing any type of gainful occupation. (Tr. at 298.)

By letters dated October 1, 2001, and October 3, 2002, Jeffrey Priddy, M.D. of Shawnee Hills (now known as Prestera), wrote that he treated Claimant for bipolar disorder, mixed with long term features and that this condition had become treatment resistant. He opined that this condition "prevents her from being able to work or engage in work/education related activities." (Tr. at 300-01.)

Evidence Submitted to the Appeals Council

By letter dated November 4, 2002, Dr. Ede wrote that he treated Claimant from 1998, through 2000. Although he acknowledged he had not seen the Claimant in two years, he opined that Claimant cannot perform "any meaningful work with the right arm and she has chronic pain in that area. As such, I think it will be difficult for her [to] find suitable employment based on her educational background and her condition that was evaluated at her last appointment." (Tr. at 302.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to identify all of Claimant's severe impairments and properly consider

17

whether Claimant met or equaled Listings 12.04, 12.06 and 12.07; (2) the ALJ erred in his pain and credibility findings; and (3) the ALJ's vocational assessment failed to incorporate all of Claimant's severe impairments and resulting limitations. (Pl.'s Br. at 4-19.)

The Commissioner argues that (1) substantial evidence supports the ALJ's finding that Claimant was not disabled; (2) Claimant does not meet or equal any listing; and (3) the ALJ's credibility findings are supported by substantial evidence. (Def.'s Br. at 11-16.)

Claimant first argues that the ALJ erred in failing to find the following impairments severe: right shoulder/right upper extremity (dominant), a chronic pain syndrome, obsessive compulsive characteristics, post traumatic stress and a panic disorder. Claimant cites to certain evidence from Dr. Deer, Dr. Loimil and Dr. Ede and argues that the ALJ ignored such evidence. Likewise, Claimant argues that the ALJ ignored evidence from Dr. Hutton, Dr. Smith and Dr. Priddy. Claimant asserts that Claimant's impairments, when combined, render her totally disabled. (Pl.'s Br. at 6-9.)

The court proposes that the presiding District Judge find that the ALJ's determination that Claimant suffers from the severe impairments of degenerative disc disease of the cervical spine, a bipolar disorder, depression and anxiety is supported by substantial evidence and that the ALJ did not err in failing to

find the following impairments severe: "right shoulder/right upper
extremity (dominant), a chronic pain syndrome, ... obsessive
compulsive characteristics, post traumatic stress and panic
disorders ...." (Pl.'s Br. at 6.)

Regarding Claimant's severe physical impairments, the ALJ's
determination that Claimant suffers from the severe impairment of
degenerative disc disease of the cervical spine adequately
describes Claimant's right shoulder impairment. The ALJ did not
err in failing to find that Claimant had a severe chronic pain
disorder. The ALJ's decision contains a thorough consideration of
Claimant's subjective complaints of pain in keeping with the
applicable regulation, caselaw and social security ruling ("SSR").
(Tr. at 23); 20 C.F.R. § 404.1529(b) (2002); SSR 96-7p, 1996 WL
374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir.
1996). The ALJ ultimately determined that Claimant's subjective
complaints of pain were not entirely credible, and that
"[n]onexertionally, her mild to moderate pain does not interfere
with her ability to perform jobs not requiring significant use of
the right hand and arm for prolonged repetitive movements." (Tr.
at 24.)

Contrary to Claimant's assertions, the ALJ considered the
evidence of record from Dr. Deer, Dr. Loimil and Dr. Ede in his
decision and adequately summarized it. (Tr. at 21.) Though
Claimant cites to specific evidence from these physicians he

19

believes the ALJ improperly ignored, the evidence of record from Dr. Deer, Dr. Loimil and Dr. Ede summarized above and set forth in the ALJ's decision and the results of objective testing including MRIs, x-rays and EMGs, which were consistently negative, constitute substantial evidence of record supporting the ALJ's decision.

Claimant asserts the ALJ ignored a November 4, 2002, report from Dr. Ede in which Dr. Ede stated that Claimant was disabled. (Pl.'s Br. at 7.) This evidence was first submitted to the Appeals Council and, as such, could not have been considered by the ALJ. The Appeals Council specifically incorporated the evidence from Dr. Ede into the administrative record and determined it did not provide a basis for changing the ALJ's decision. (Tr. at 6.) As a result, the court must review the record as a whole, including the new evidence, in order to determine if the Commissioner's decision is supported by substantial evidence. Wilkins v. Secretary, 953 F.2d 93, 96 (4th Cir. 1991).

Substantial evidence supports the determination of the Appeals Council that the new evidence from Dr. Ede does not provide a basis for changing the ALJ's decision. Dr. Ede stated in his November 4, 2002, letter that he last saw Claimant on November 6, 2000. He opined that Claimant was "experiencing a pain syndrome as a result of her injury that renders her right upper extremity essentially useless." (Tr. at 302.) Dr. Ede provided no additional evidence in support of this assertion. The remaining substantial evidence

20

of record from Dr. Loimil, Dr. Bachwitt, Dr. Deer and even Dr. Ede
does not support a finding that Claimant's right shoulder
impairment alone is disabling.  Dr. Loimil opined that Claimant has
a very serious "problem complicated by complex regional pain
syndrome.  There is no neurological involvement by EMG according to
Dr. Ede [who] is a very capable Orthopedist.  He stated that there
is no further surgery that he can offer to the patient."  (Tr. at
298.)  Dr. Loimil recommended that Claimant undergo a functional
capacity evaluation and vocational rehabilitation to determine if
she is capable of performing any type of gainful occupation.  (Tr.
at 298.)  Dr. Ede eventually advised Claimant he could offer no
additional treatment to her and directed her to continue care with
Dr. Deer.  Dr. Deer in turn ultimately referred Claimant to Dr.
Smith, who conducted a psychological evaluation and opined that
"[d]ue to the high levels of somatization, the childhood history of
abuse, and her gross exaggeration on psychological testing, she
would be a poor candidate for any invasive pain management
procedures."  (Tr. at 261.)  In any event, the ALJ found that
Claimant could not perform jobs requiring significant use of the
right hand and arm for prolonged repetitive movements.  (Tr. at
24.)

    Likewise, the ALJ's determination that Claimant suffers from
the severe mental impairments of bipolar disorder, depression and
anxiety is supported by substantial evidence and the ALJ did not

err in failing to find severe, Claimant's "obsessive compulsive, post traumatic stress and pain disorders ...." (Pl.'s Br. at 6, 8-9.)  Dr. Hutton of Shawnee Hills noted diagnoses on December 8, 1999, of obsessive compulsive disorder, post traumatic stress disorder and panic disorder, among others, but he also rated Claimant's GAF at 60, found her mood to be stable and attention and memory not as good as they used to be because of cumulative stressors.  Claimant's mood was stable.  Recent memory, remote memory and immediate memory were all good. (Tr. at 226.)  Notably, treatment notes after December 1999, generally indicate that Claimant's condition improved with treatment. (Tr. at 207-21.)

While Dr. Priddy of Prestera, formerly Shawnee Hills, stated on a prescription pad on August 14, 2001, and again in letters dated October 1, 2001, and October 3, 2002, that Claimant was suffering from bipolar disorder, moderate to severe, and unable to work, this is not consistent with the above treatment notes indicating an improvement in Claimant's symptoms with treatment.  The court acknowledges that the ALJ does not specifically mention the opinions of Dr. Priddy in his decision, though he does consider the treatment notes from Shawnee Hills in his decision.

While it was error for the ALJ not to specifically mention the opinions of Dr. Priddy, a treating source, the court proposes that the presiding District Judge find this error harmless.  Courts have applied a harmless-error analysis in the context of Social Security

22

appeals.  One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by Morris will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

<u>Morris v. Bowen</u>, 864 F.2d 333, 335 (5th Cir. 1988); <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989)("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach.  <u>See</u>, <u>e.g.</u>, <u>Bishop v. Barnhart</u>, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); <u>Camp v. Massanari</u>, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); <u>Spencer v. Chater</u>, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

The ALJ considered the treatment notes from Shawnee Hills, most of which indicate progressive improvement in Claimant's condition.  Furthermore, Dr. Priddy's brief letters are not supported by object clinical and laboratory diagnostic techniques. <u>See</u> <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996) (a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not

23

inconsistent with other substantial evidence").

Based on the above, the court proposes that the presiding District Judge find that substantial evidence supports the ALJ's determination regarding Claimant's severe impairments. The court further proposes that the presiding District Judge find that substantial evidence supports the ALJ's pain and credibility analysis.

Next, Claimant argues that the ALJ erred in failing to find that she meets Listings 12.04, 12.06 and 12.07. (Pl.'s Br. at 9-15.)

In his decision, the ALJ evaluated Claimant's mental impairments under Listings 12.04, 12.06 and 12.07. The ALJ determined that Claimant did not meet the "B" criteria for any of these Listings. The "B" criteria for each of these listings requires a finding of at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace and repeated episodes of decompensation each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06 and 12.07 (2002). Instead, the ALJ determined that Claimant has only mild restriction in activities of daily living and social functioning and moderate restriction in maintaining concentration, persistence and pace. The ALJ made no explicit finding about episodes of deterioration,

24

though the court presumes the ALJ intended to find no such episodes as there is no such episode reported.  (Tr. at 23.)

Although Claimant asserts that the ALJ made no explanation as to these findings, a review of the ALJ's decision reveals that in fact, the ALJ adequately explained his findings in this regard. Specifically, the ALJ explained that Claimant

> is independent in self-care and only requires assistance with dressing.  She reported watching television at least three hours per day and she visits with family.  She performs household chores including dusting furniture and laundry despite her allegations of disabling pain.  These daily activities are consistent with the performance of at least sedentary work.  The record shows that the claimant leaves her house on a routine basis to attend medical and counseling sessions and to pickup her medications.  The record does not reflect difficulties in getting along with former employers or in adapting to changes in the workplace.  On December 8, 1999, the claimant's treating psychiatrist reported that the medication Xanax had been very effective for anxiety. She was neurologically alert and cooperative with no evidence of mixed mood states.  Her global assessment of functioning was 60.  As for concentration, persistence and pace, the claimant indicated that she had trouble concentrating due to pain and depression.  Treatment notes indicate that the claimant was well oriented and that her immediate, recent, and remote memories are intact.

(Tr. at 23.)  The ALJ's findings are supported by and consistent with the objective medical evidence of record cited above and in the ALJ's decision.  Thus, the court proposes that the presiding District Judge find that substantial evidence supports the ALJ's determination that Claimant does not meet or equal Listings 12.04, 12.06 or 12.07.

Finally, Claimant argues that the ALJ's hypothetical question

was flawed because the ALJ failed to include limitations in his hypothetical question related to "loss of use of her dominant upper right extremity, her chronic pain and the disabling effects of her multiple psychiatric impairments." (Pl.'s Br. at 19.) Claimant asserts that his counsel's hypothetical question to the vocational expert included all of the limitations supported by substantial evidence and that the vocational expert's response, indicating that no jobs were available, should have been accepted by the ALJ. (Pl.'s Br. at 19.)

The court proposes that the presiding District Judge find that the ALJ's hypothetical question included those limitations supported by substantial evidence of record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (While questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.). The ALJ limited Claimant to sedentary work, further limited by mild to moderate pain in the right arm, neck, right shoulder and right hand, drowsiness due to medication and an inability to use her right arm and hand for prolonged repetitive movement, a history of seizure disorders and anxiety and depression, which were mild to moderate in frequency and severity. (Tr. at 334.) For the reasons discussed elsewhere in the court's proposed findings and recommendation, the court proposes that the presiding District Judge find that the

limitations opined by the ALJ in his hypothetical question are supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge DENY the Plaintiff's Motion for Judgment on the Pleadings or in the Alternative for Remand, GRANT the Defendant's Motion for Judgment on the Pleadings, AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Robert C. Chambers.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn,

474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

<u>  August 2, 2005  </u>
        Date

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge